UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION at LAFAYETTE

| | | |
|---|---|---|
| KIMBERLY S. ROSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 4:19CV39-PPS |
| | ) | |
| MLO ACQUISITIONS LLC and | ) | |
| WALTER CHRISTIAN MEYER, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Kimberly Rosen's complaint tells a jarring tale of the deleterious effects that the collection of a bogus debt had on her. Defendants MLO Acquisitions, LLC and attorney W. Christian Meyer are the debt collectors responsible and they admit that their actions against Rosen violated a number of provisions of the Fair Debt Collection Practices Act. But the parties have been unable to resolve the question of whether Rosen has amassed enough evidence to establish triable issues of fact about her damages for emotional distress. MLO and Meyer seek partial summary judgment on that issue.[1] Based on the record presented, I find there is sufficient evidence to present the issue of emotional distress damages to a jury. So MLO and Meyer's motion will be denied.

---

[1] Defendants' motion also indicates that it will challenge Rosen's claim to recover attorney fees incurred in defending the underlying state court action. [DE 35 at 2.] But, as Rosen points out in response, defendants do not further address the attorney fees issue. [DE 37 at 9.] In their reply, MLO and Meyer again fail to address any issue relating to attorney fees. [DE 40.] I consider no summary judgment argument to have been presented on that question.

## Background

Before getting into the facts, I'll begin by discussing how summary judgment practice is supposed to work under our local rules. In order to present the court with a framework for determining what the material facts are, and which are disputed, Local Rule 56-1 sets out a summary judgment procedure that describes each party's obligations. MLO and Meyer, as the moving parties, are required to "include a section labeled 'Statement of Material Facts' that identifies the facts that the moving party contends are not genuinely disputed." N.D.Ind. L.R. 56-1(a). Defendants' brief meets this requirement, and the requirements of Fed.R.Civ.P. 56(c)(1)(A), with a "Statement of Material Facts" consisting of 39 numbered paragraphs setting out statements of fact and providing citations to evidence of record supporting each. [DE 35 at 2-39.]

For her part, Rosen as the opposing party is required to "include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." N.D.Ind. L.R. 56-1(b)(2). Rather than respond specifically to the facts as MLO and Meyer have asserted them, the "Statement of Genuine Disputes" in Rosen's opposition brief sets out just three "genuinely disputed" matters, namely whether she "suffered actual damages," whether she "suffered emotional distress injuries," and the "amount of Plaintiff's actual damages." [DE 37 at 8.]

These broadly-crafted issues fail to meet the requirements of Local Rule 56-1 in a manner that creates a genuine dispute of any of the material facts MLO and Meyer have

specifically identified and supported with evidence.  In addition to failing to meet the movant's numerous assertions of specific facts head-on, Rosen fails to meet the requirement of Federal Rule 56(c)(1)(A) and (B) that a "party asserting that a fact…is genuine disputed must support the assertion by…citing to particular parts of materials in the record…or showing that the materials cited do not establish the absence…of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Rosen's "Statement" is entirely summary, and neither cites nor discusses any evidence at all.  Rosen may well have taken this approach in part because the parties are essentially in agreement as to the underlying facts, and their dispute is more about the application of law to those facts.  In any event, in view of Rosen's failure to properly address MLO and Meyer's assertions of act in according with the governing rules of procedure, I will "consider [those facts] undisputed for purposes of the motion."  Fed.R.Civ.P. 56(e)(2).  The undisputed facts pertinent to my summary judgment analysis are as follows.

Rosen was formerly married to a man named John Hudelson.  They divorced in May 2010.  In December 2011, Meyer filed a lawsuit in Tippecanoe County, Indiana against Hudelson on behalf of Lafayette Otolaryngology Associates, Inc. (LOA) to collect an alleged medical debt.  In January 2012, Meyer obtained a default judgment against Hudelson.  More than six years went by, and in April 2018, Meyer named Rosen in an attempt to get a judgment against her for Hudelson's unpaid debt to LOA.  The summons was sent to a corporate office of Rosen's employer, The Kroger Co., in

3

Hutchinson, Kansas. Rosen did not receive notice of the collection action, and never appeared to defend it. A default judgment was entered against Rosen for $4,382.53 plus court costs of $90.

MLO purchased the debt from LAO, and Meyer initiated proceedings supplemental to collect on the default judgment against Rosen. Interrogatories and an order to appear for a hearing were sent to Kroger, which acknowledged receipt of the documents and indicated that the information had been forwarded to the address on file for Kimberly Hudelson, Rosen's married name. After Rosen did not appear for the proceedings supplemental hearing, Meyer and MLO obtained a Final Order of Garnishment against Rosen, dated November 27, 2018. On December 10, 2018, Kroger sent correspondence to Rosen which for the first time informed her of the collection action and that her wages were to be garnished to satisfy the default judgment.

In her deposition, Rosen testified in detail about the anxious phone calls she made in the immediate aftermath of receiving the garnishment notice, and the emotional impact of the distressing news in the days thereafter. Her testimony, cited by movants in their Statement of Material Facts, is discussed in greater detail in the analysis below. Once she found counsel to represent her in challenging the default judgment, Rosen was granted relief from the garnishment order on January 16, 2019. Five months later on June 4, 2019, Meyer and MLO filed a consent to set aside the default judgment, acknowledging that they lacked conclusive proof that Rosen had been served with notice of the action. In this case under the FDCPA, Meyer and MLO

4

have admitted liability for all causes of action except those alleging that MLO violated 15 U.S.C. §1692j and that Meyer harassed Rosen in violation of 15 U.S.C. §1692d.

Several years prior to the events underlying this case, Rosen was diagnosed with Generalized Anxiety Disorder. She has been treated for GAD by Nurse Practitioner Amy Ellingwood since July 2016. During the course of her treatment with Ellingwood, Rosen has discussed personal issues that increased her anxiety, including her separation and divorce, conflict with a former boss, and a family trauma involving the incestuous rape of a minor family member. Rosen never discussed the state court default judgment and garnishment with Ellingwood. On her last visit preceding notice of the garnishment, in September 2018, Rosen presented with increased anxiety, reporting stress associated with her niece being raped by the niece's grandfather, and continued stress on her job. Rosen next saw Ellingwood in June 2019, at which time Rosen reported occasional anxiety attacks but Ellingwood noted that Rosen's stress was "well controlled with as-needed BuSpar."

## Discussion

As noted above, the defendants seek partial summary judgment on Rosen's claim for emotional distress damages. Summary judgment is proper under Fed.R.Civ.P. 56 if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (internal citations omitted). A genuine

dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The FDCPA authorizes recovery of actual damages resulting from a debt collector's violation of any provision of the Act. 15 U.S.C. §1692k(a)(1). Damages for emotional harm and out-of-pocket expenses incurred are compensable under the FDCPA. *Thomas v. Boscia*, No. 1:08-cv-42-WTL-TAB, 2009 WL 2778105, at *6 (S.D.Ind. Aug. 28, 2009). Of course, the plaintiff bears the burden to prove that she is entitled to actual damages. *Sinclair v. Halsted Financial Services, LLC*, No. 1:15-cv-00003-TWP-MJD, 2015 WL 5824931, at *2 (S.D.Ind. Oct. 6, 2015).

It's not enough for the plaintiff to just spout off some buzzwords in order to get her case to a jury. She can't just say in a conclusory way that "I'm a wreck" or "my grief is overwhelming" and then expect to get her case to a jury. Rather, she has to show that the emotional toll is real . As the Seventh Circuit has stated: "[W]hen the injured party's own testimony is the only proof of emotional damages, he must explain the circumstances of his injury in reasonable detail; he cannot rely on mere conclusory statements." *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 610 (7th Cir. 2005). In other words, "bare allegations by a plaintiff that the defendant's conduct made him 'depressed,' 'humiliated,' or the like are

6

not sufficient to establish injury unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Denius*, 330 F.3d at 929, citing *Alston v. King*, 231 F.3d 383, 388 (7th Cir. 2000); *United States v. Balistrieri*, 981 F.2d 916, 931-32 (7th Cir. 1992).

MLO and Meyer invoke these principles claiming that Rosen's evidence of emotional distress is much too conclusory to get this case to a jury. For her part, Rosen does not dispute that these principles govern the issue. The question is whether Rosen's evidence is sufficient to warrant submission of the issue to a jury that could reasonably return a damage award in her favor for emotional distress. So what is her evidence on the point?

Rosen first learned of the claim against her when she received a notice from Kroger, her employer, advising that her wages would be garnished starting with her next paycheck. [DE 36-2 at 52.] She had no prior knowledge at all of LOA's claim against her ex-husband or any of the associated litigation. On the reverse of the Kroger letter was a photocopy of the final garnishment order, which identified LOA as the creditor. [*Id*.] The garnishment order reflected the amount Rosen owed as $4,898.81, subject to continuing interest. [DE 36-8 at 2.]

In an attempt to understand what had happened and get the matter straightened out, Rosen made a series of four phone calls seeking help that day. But everywhere she turned, she was stiff-armed and with each call, her anxiety mounted. The first was to LOA, which was able to explain that the debt related to services provided to her ex-

7

husband, but merely directed her to contact Meyer for any further help or information. [DE 36-2 at 53-4.] When she called Meyer's office, she was told he was out of the office for the week. Next Rosen reached out to her own attorney, who, after "looking up" the underlying litigation, unhelpfully advised her that her "time to dispute had run out and that [she] was going to have to pay this debt." [*Id*. at 54.] Next, based on her understanding that her divorce decree required her ex-husband to shoulder the underlying medical expenses, Rosen contacted Hudelson's daughter-in-law, with whom Rosen had a positive relationship, and explained the situation in hopes that Hudelson's family would take care of the debt. [*Id*. at 55.] But after waiting and pacing while the woman spoke with her husband about the matter, Rosen received a disappointing response – her ex's family would not help her. [*Id*.]

Rosen testified at her deposition that at this point she was "really, really starting to panic and be very afraid." [*Id*.] She was not merely dealing with the annoyance of debt collection efforts, but the tangible consequences of unlawful yet successful debt collection efforts against her of which she had no prior notice. These circumstances are not the equivalent – emotional or otherwise – of having to defend against even a wrongly filed collection action. Rosen was facing the imminent garnishment of her paycheck, on which she depends, with no advance warning of this possibility.

Continuing in her deposition testimony, Rosen describes the situation:

> ...I live on my own. I live by myself. I don't have any help and if my wages are reduced, I'm going to be in trouble and I knew that, but I also didn't understand how this could possibly be. How could my time to dispute run out so now I can't dispute, but I never even knew it was going on. I never

8

>even knew this was in the works happening. I never received anything. I never received a phone call, never received a bill, never received a service of any sort....
>
>....I paced and my mind just kept running around in circles, how could this be and trying to think of different ways maybe I could get it resolved, but I was also desperate because if Mr. Meyer was going to be out for two weeks, I didn't know when this garnishment was going to start. It didn't say. It didn't say how much. It didn't say for how long. I didn't know any of these things. So I didn't know what was going to happen. My stomach was in knots. My heartbeat was not regular because of the stress and the anxiety and the worry.
>
>I tried to go to bed. I remember trying to go to bed. There was no way I was going to go to sleep. I tossed and turned and would get up and pace. Before I went to bed I called a few people, my support group, to see if anybody had any advice, been through anything like this before, any moral support words that might help me fell better, but they didn't.

[*Id*. at 55-56.]

>The next day at work, on very little sleep, Rosen's distress continued:
>
>"My job requires quite a bit of concentration. I have to really keep track of what I'm doing and there was no – I couldn't – I just couldn't – I would find myself just standing there staring and trying to figure out how am I going to – how am –how am I going to do this? How am I going to pay this? If it comes up – the attorney told me that I would have to pay it. If it comes down to that, what am I going to do? What are my options? How can I get this resolved? How can this even be happening? I had a terrible headache. My hands were shaking. I remember I was trying to write on a cake for a lady and my hands were just shaking. My whole body was trembling to some degree."

[*Id*. at 57.] Rosen testified that her boss could see she was in distress and asked what was wrong. [*Id*.] After hearing the explanation, her boss told her to go home. [*Id*. at 57-58.] But Rosen felt she couldn't: "[B]ut I couldn't go home you know. My wages are about to be garnished. I have to work every hour I can work." [*Id*. at 58.]

9

That day after work, Rosen contacted another attorney who advised her, as her own attorney previously had, that she was stuck with the debt and he could not help her. [*Id.*] Rosen testified: "So I got off the phone with him and with every phone call that I made I felt more and more hopeless and helpless and desperate." [*Id.*] That evening, in view of the $5,000 debt she faced, she went to her brother's house to tell him that she would not be able to afford the trip to Europe they had been planning. [*Id.*] Her distress continued to affect her: "They invited me to stay for supper, but I didn't want to eat anything. They invited me to stay just for support and I tried to sit down on their couch and you know, just hang out with them, but I just couldn't do it. I couldn't get my mind off this lawsuit. I couldn't even carry on a conversation. I was so obsessed with what was going to happen, what was happening." [*Id.* at 58-9.]

Back at home that evening, Rosen "sat on the couch and I remember I cried for quite a while and the phone rang and I wouldn't answer it." [*Id.* at 59.] She contemplated worst case scenarios: "Well, I can ask my kids, one of my two oldest kids if I can move in with them until this debt gets paid and I get back on my feet and that was one of the most devastating horrible thoughts that ever went through my head, that I might have to move in with my kids when I had been doing so well, through no fault of my own, nothing that I did." [*Id.*] Rosen testified that she didn't sleep again that night, and that her loss of appetite continued: "I think I lost eight pounds that first week." [*Id.*] The next day Rosen consulted a third attorney, who gave her the same dispiriting assessment. With that news, Rosen started to give up hope, and remembers thinking she was going to

10

vomit. [*Id*.] At that attorney's suggestion, Rosen contacted the lawyer who represents her in this suit. [*Id*.] Rosen had a side job as a housecleaner. [*Id*. at 61.] While she made the call to counsel, she sat in her car outside her client's house so as not to be overheard because "[b]eing sued and having your wages garnished is a very embarrassing humiliating thing." [*Id*.]

Although counsel agreed to try to help Rosen, he was uncertain whether "he could make it go away." [*Id*. at 62.] For the next three or four days, Rosen took Buspirone, an anti-anxiety medication. [*Id*.] She testified that she continued to shake almost constantly, still feeling uncertain that her new attorney could rectify the situation. [*Id*.] When her daughter called and asked to borrow $100, Rosen "told her I couldn't do it because I needed to hang onto every penny because I didn't know where this was going." [*Id*.]

> Rosen explained why the prospect of the garnishment impacted her so greatly.
>
> Even if it's not your fault and you know it's not your fault, the people that are going to know about this, they don't know that it's not your fault and my credit rating, I knew that my credit rating was going to take nosedive over there and it wasn't because I didn't pay it, it was because somebody I loved 14 years ago didn't pay his bills. My credit rating is now going to fall and if I want to buy a new car or if I want to buy a home, I'm SOL. I worked hard for that credit rating and now I'm just SOL.
> What little bit of safety net I had, this lawsuit was going to effect (sic) that. I had a little bit of a safety net, I thought maybe for [un]expected expenses, maybe a tiny little bit of extra retirement. It was just going to really, really, really change my life.

[*Id*. at 61-2.] Addressing the erroneous judgment and garnishment required five trips to Lafayette to meet with her lawyer and for court dates, necessitating time off work. [*Id*. at

63.]  Rosen testified that she suffered "massive headaches, heart palpitations, extreme stress, extreme anxiety." [*Id.*]

Although Rosen regularly saw Nurse Practitioner Amy Ellingwood for treatment of GAD, Rosen did not share this anxiety and its source with her.  Rosen explained why in her deposition:

> Because to discuss it with Amy Ellingwood would have meant to have had to tell her what was going on.  Like I said, when you're being sued and your wages are being garnished, you pretty much don't want anybody to know that doesn't really need to know.  That can't benefit you and the only way she could benefit me was to do the anxiety medication, which she did.

[*Id.* at 66.]

This detailed testimony clearly provides a sufficiently substantial explanation of Rosen's distress caused by MLO and Meyer's FDCPA violations, and meets the applicable standard for a claim for emotional damages.  This conclusion does not require consideration of whether the circumstances here were so "inherently degrading" as to create an inference of emotional distress.  The latter standard applies only where the plaintiff's own testimony is merely conclusory, which certainly cannot be said of Rosen's lengthy explanations of her emotional reaction to the news of the wrongful garnishment, and its impact on her life and function.

MLO and Meyer also argue that Rosen herself attributes her emotional distress to lack of notice (which is, they contend, not itself a violation of the FDCPA) rather than on "the filing of a lawsuit on a debt she did not owe," which defendants admit "was improperly filed." [ DE 35 at 20.]  That is a creative but unpersuasive characterization of

Rosen's testimony. Although she refers several times to the frustration associated with being entirely unaware of the attempt to collect the debt from her until receiving notice of the garnishment, Rosen's testimony also makes clear that the prospect of owing a debt she could not afford when she did not believe she should be held responsible for it was at the root of her anxiety and stress. Because Rosen does not attribute her distress entirely or chiefly to the lack of prior notice, I find little significance in defendants' lengthy arguments about the adequacy of their earlier service of process initiating the collection action against Rosen. As Rosen points out, whether or not service was proper, "there is a genuine issue of material fact as to whether Ms. Rosen's emotional distress proximately arose from the filing of the illegal lawsuit regardless of whether Attorney Meyer's chosen method of service is also a distinct FDCPA violation." [DE 44-1 at 3.]

I agree with Rosen that MLO and Meyer's reliance on the testimony of NP Ellingwood does not defeat Rosen's claim for emotional damages. Ellingwood treated Rosen throughout the relevant time period for Generalized Anxiety Disorder, for which Ellingwood prescribed anti-anxiety medication. Rosen explained that since embarrassment about the situation was one source of her anxiety, she did not relate the matter to Ellingwood, from whom Rosen already received the anti-anxiety prescription that Rosen believed was Ellingwood's primary contribution to alleviating Rosen's anxiety. By June 2019, when Rosen next saw Ellingwood, her report that her anxiety was well controlled does not contradict Rosen's testimony about her emotional distress in December 2018. By mid-2019, Rosen was represented by counsel, the garnishment had

13

been stopped, and Rosen's dispute with MLO and Meyer, though still stressful, was less acute. [DE 36-2 at 79, 87.] That Ellingwood could not testify that the lawsuit about her husband's debt caused Rosen stress and anxiety does not undermine Rosen's testimony that it did. [DE 36-4 at 40.] Because Rosen did not discuss the matter with Ellingwood, she had no basis for offering an opinion. [*Id*. at 66-7.]

In their reply, MLO and Meyer amplify a twist on their arguments relating to Rosen's treatment with Ellingwood. By this point MLO and Meyer concede that "Rosen has offered sufficient detail of her claimed emotional injuries to avoid being labeled conclusory under the authority cited by both parties." [DE 40 at 2.] So MLO and Meyer contend that only "garden variety" claims of emotional harm can be presented to a jury based on lay testimony alone, and that Rosen's claim is not "garden variety" because it depends on "specific references to the symptoms of GAD, supplemented with testimony from her nurse practitioner." [DE 40 at 3.] Defendants cite no authority for the principle they urge. And the portions of Rosen's brief they cite do not present her claim in the way they characterize it. To the contrary, Rosen's descriptions of her emotional harm fall with defendants' description of "garden variety" claims, involving feelings likely to be experienced by anyone in Rosen's circumstances. [DE 40 at 7.]

Further, Rosen does not rely on her treater's testimony to establish her claims of emotional harm. To the contrary, Ellingwood repeatedly testified in her deposition that having one's wages garnished could cause stress for some people, but would not for others, and she did not know whether Rosen suffered stress due to the garnishment

14

because the two did not discuss it and Ellingwood was unable to assess Rosen in that context. [DE 36-4 at 15, 16, 33, 37, 41, 58.] I disagree with MLO and Meyer's contention that Rosen "bolsters and supplements her personal testimony on damages with the testimony of her own treating nurse practitioner." [DE 40 at 5.] Rosen merely acknowledges the fact that she had been previously diagnosed with GAD, for which she saw NP Ellingwood. These circumstances may open the door to a factual dispute about the causation of the emotional distress Rosen attributes to the garnishment situation, but the manner in which Rosen presents and supports her claim for emotional damages does not rely on her history of GAD or the testimony of Ellingwood, and is not properly characterized as "a medically-based claim for emotional damages." [DE 40 at 6.]

Rosen's claims of emotional distress find support in *Catalan v. GMAC Mortgage Corp.*, 629 F.3d 676, 696 (7th Cir. 2011), and *Boerner v. LVNV Funding LLC*, 358 F.Supp.3d 767, 781 (E.D.Wisc. 2019). As the Seventh Circuit similarly concluded in *Catalan*, Rosen's testimony is not conclusory and described her "emotional turmoil in reasonable detail and explained what [she] believe[s] to be the source of that turmoil." *Catalan*, 629 F.3d at 696. OF course, MLO and Meyer will be "free to argue…that any such distress was minor and that other stressors in the plaintiff['s] OH li[fe] were the true causes of [her] distress, but [Rosen's] testimony is sufficient to preclude summary judgment..on the question of whether plaintiff[]suffered emotional harm as a result of [defendant's] actions – and inaction." *Id*. But those arguments will have to be made to a jury. Summary judgment will therefore be denied.

15

## Conclusion

The undisputed facts of this case are distinguishable from a scenario presenting only the filing of an improper lawsuit against a debtor. Here the impact of an improper lawsuit was significantly compounded because Rosen received no notice of the action until all appeared to be said and done, and she was presented with a notice of garnishment for a substantial debt that she did not owe. Rosen's testimony of anxious and unsuccessful efforts to find help, confusion about how she could be liable for her ex-husband's debt with no notice and opportunity to defend, despair over losing her home, her credit rating and her planned European trip, her inability to sleep or eat or concentrate at work, headaches, heart palpitations, trembling, and racing thoughts are much more than just conclusions. Instead, they create a triable issue of fact.

Because the motion for partial summary judgment is denied, the January 7, 2021 setting will be converted from oral argument on the motion back into a status conference to discuss next steps toward the disposition of the case.

ACCORDINGLY:

Plaintiff's Motion to Strike Inadmissible Material [DE 38] is DENIED without prejudice.

Defendants MLO Acquisitions, LLC and Walter Christian Meyer's Motion for Summary Judgment [DE 34] is DENIED.

The telephonic oral argument previously scheduled for January 7, 2021 at 9:30 a.m. Central/Hammond time is converted to a status conference.

SO ORDERED.

ENTERED:  December 4, 2020.

    /s/   Philip P. Simon
UNITED STATES DISTRICT JUDGE