**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION at LAFAYETTE**

| | | |
|---|---|---|
| KIMBERLY S. ROSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 4:19CV39-PPS |
| | ) | |
| MLO ACQUISITIONS LLC and | ) | |
| WALTER CHRISTIAN MEYER, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

In this case brought under the Fair Debt Collections Practices Act, the plaintiff, Kimberly Rosen, has settled her dispute with the debt collectors, but the issue of attorney fees remains for my consideration. Rosen seeks attorney fees in excess of $100,000. [DE 65, 72.] The defendants claim the fees sought are vastly overstated and suggest a fee award of $40,000. [DE 66.] Because Rosen's fee petition is well supported by affidavits from the lawyers and by experts as well, and further because defendants have presented no evidence to the contrary, Rosen's fee request will be granted in full.

#### Background

Defendants MLO Acquisitions, LLC and attorney W. Christian Meyer are the debt collectors and they admit that their actions in attempting to collect a debt against Kimberly Rosen violated a number of provisions of the Fair Debt Collection Practices Act. In particular, the defendants admit that they violated the FDCPA by suing Rosen to collect a debt she did not owe, by failing to make mandatory disclosures required by the

FDCPA, by making false and misleading representations concerning the debt and Rosen's alleged responsibility for the debt, and by filing the lawsuit in an improper venue. [DE 35 at 1-2.] What follows are the facts that led to their admission of liability.

Rosen was formerly married to a man named John Hudelson. They divorced in May 2010. In December 2011, Meyer filed a lawsuit in Tippecanoe County, Indiana against Hudelson on behalf of Lafayette Otolaryngology Associates, Inc. (LOA) to collect an alleged medical debt. In January 2012, Meyer obtained a default judgment against Hudelson. More than six years went by, and in April 2018, Meyer named Rosen in an attempt to get a judgment against her for Hudelson's unpaid debt to LOA. The summons was sent to a corporate office of Rosen's employer, The Kroger Co., in Hutchinson, Kansas. Rosen did not receive notice of the collection action, and never appeared to defend it. A default judgment was entered against Rosen for $4,382.53 plus court costs of $90.

MLO purchased the debt from LOA, and Meyer initiated proceedings supplemental to collect on the default judgment against Rosen. Interrogatories and an order to appear for a hearing were sent to Kroger, which acknowledged receipt of the documents and indicated that the information had been forwarded to the address on file for Kimberly Hudelson (Rosen's married name). After Rosen did not appear for the proceedings supplemental hearing, Meyer and MLO obtained a Final Order of Garnishment against Rosen, dated November 27, 2018.

Rosen first learned of the claim against her when she received a notice on December 10, 2018 from Kroger, her employer, advising that her wages would be garnished starting with her next paycheck.  [DE 36-2 at 52.]  She had no prior knowledge at all of LOA's claim against her ex-husband or any of the associated litigation.  On the reverse of the Kroger letter was a photocopy of the final garnishment order, which identified LOA as the creditor.  [*Id*.] The garnishment order reflected the amount Rosen owed as $4,898.81, subject to continuing interest.  [DE 36-8 at 2.]

Rosen was understandably distressed about receiving the news that she had a judgment against her based on actions of her ex-husband. In an attempt to understand what had happened and get the matter straightened out, Rosen made a series of four phone calls seeking help that day. But everywhere she turned, she was stiff-armed and with each call, her anxiety mounted. The first was to LOA, which was able to explain that the debt related to services provided to her ex-husband, but merely directed her to contact Meyer for any further help or information.  [DE 36-2 at 53-54.] When she called Meyer's office, she was told he was out of the office for the week.  Next Rosen reached out to her own attorney, who, after "looking up" the underlying litigation, unhelpfully advised her that her "time to dispute had run out and that [she] was going to have to pay this debt."  [*Id*. at 54.]  Next, based on her understanding that her divorce decree required her ex-husband to shoulder the underlying medical expenses, Rosen contacted Hudelson's daughter-in-law, with whom Rosen had a positive relationship, and explained the situation in hopes that Hudelson's family would take care of the debt.  [*Id*.

at 55.] But after waiting and pacing while the woman spoke with her husband about the matter, Rosen received a disappointing response – her ex's family would not help her. [*Id.*]

Rosen testified at her deposition that at this point she was "really, really starting to panic and be very afraid." [*Id.*] She was not merely dealing with the annoyance of debt collection efforts, but the tangible consequences of unlawful yet successful debt collection efforts against her of which she had no prior notice. These circumstances were not the equivalent – emotional or otherwise – of having to defend against even a wrongly filed collection action. Rosen was facing the imminent garnishment of her paycheck, on which she depends, with no advance warning of this possibility.

Here's how Rosen described her angst in her deposition:

...I live on my own. I live by myself. I don't have any help and if my wages are reduced, I'm going to be in trouble and I knew that, but I also didn't understand how this could possibly be. How could my time to dispute run out so now I can't dispute, but I never even knew it was going on. I never even knew this was in the works happening. I never received anything. I never received a phone call, never received a bill, never received a service of any sort....

....I paced and my mind just kept running around in circles, how could this be and trying to think of different ways maybe I could get it resolved, but I was also desperate because if Mr. Meyer was going to be out for two weeks, I didn't know when this garnishment was going to start. It didn't say. It didn't say how much. It didn't say for how long. I didn't know any of these things. So I didn't know what was going to happen. My stomach was in knots. My heartbeat was not regular because of the stress and the anxiety and the worry.

I tried to go to bed. I remember trying to go to bed. There was no way I was going to go to sleep. I tossed and turned and would get up and pace. Before I went to bed I called a few people, my support group, to see if anybody had any advice, been through anything like this before, any moral support words that might help me feel better, but they didn't.

4

[*Id*. at 55-56.]

The next day at work, on very little sleep, Rosen's distress continued:

My job requires quite a bit of concentration.  I have to really keep track of
what I'm doing and there was no – I couldn't – I just couldn't – I would find
myself just standing there staring and trying to figure out how am I going
to – how am –how am I going to do this?  How am I going to pay this?  If it
comes up – the attorney told me that I would have to pay it.  If it comes
down to that, what am I going to do?  What are my options?  How can I get
this resolved?  How can this even be happening?  I had a terrible headache.
My hands were shaking.  I remember I was trying to write on a cake for a
lady and my hands were just shaking.  My whole body was trembling to
some degree.

[*Id*. at 57.] Rosen testified that her boss could see she was in distress and asked what was

wrong.  [*Id*.]  After hearing the explanation, her boss told her to go home.  [*Id*. at 57-58.]

But Rosen felt she couldn't:  "[B]ut I couldn't go home you know.  My wages are about to

be garnished.  I have to work every hour I can work."  [*Id*. at 58.]

That day after work, Rosen contacted another attorney who advised her, as her

own attorney previously had, that she was stuck with the debt and he could not help her.

[*Id*.]  Rosen testified:  "So I got off the phone with him and with every phone call that I

made I felt more and more hopeless and helpless and desperate."  [*Id*.]  That evening, in

view of the $5,000 debt she faced, she went to her brother's house to tell him that she

would not be able to afford a trip they had been planning.  [*Id*.]  Her distress continued to

affect her:  "They invited me to stay for supper, but I didn't want to eat anything.  They

invited me to stay just for support and I tried to sit down on their couch and you know,

just hang out with them, but I just couldn't do it.  I couldn't get my mind off this lawsuit.

I couldn't even carry on a conversation.  I was so obsessed with what was going to happen, what was happening."  [*Id*. at 58-59.]

Back at home that evening, Rosen "sat on the couch and I remember I cried for quite a while and the phone rang and I wouldn't answer it." [*Id*. at 59.]  She contemplated worst case scenarios:  "Well, I can ask my kids, one of my two oldest kids if I can move in with them until this debt gets paid and I get back on my feet and that was one of the most devastating horrible thoughts that ever went through my head, that I might have to move in with my kids when I had been doing so well, through no fault of my own, nothing that I did." [*Id*.]  Rosen testified that she didn't sleep again that night, and that her loss of appetite continued:  "I think I lost eight pounds that first week." [*Id*.]

The next day Rosen consulted a third attorney, who gave her the same dispiriting assessment.  With that news, Rosen started to give up hope, and remembers thinking she was going to vomit.  [*Id*.]  At that attorney's suggestion, Rosen contacted the lawyer who represents her in this suit.  [*Id*.]  Rosen had a side job as a housecleaner.  [*Id*. at 61.]  While she made the call to counsel, she sat in her car outside her client's house so as not to be overheard because "[b]eing sued and having your wages garnished is a very embarrassing humiliating thing." [*Id*.]

Although counsel agreed to try to help Rosen, he was uncertain whether "he could make it go away."  [*Id*. at 62.]  For the next three or four days, Rosen took Buspirone, an anti-anxiety medication.  [*Id*.]  She testified that she continued to shake almost constantly, still feeling uncertain that her new attorney could rectify the situation.  [*Id*.]  When her

6

daughter called and asked to borrow $100, Rosen "told her I couldn't do it because I needed to hang onto every penny because I didn't know where this was going." [*Id*.]

Rosen explained why the prospect of the garnishment impacted her so greatly.

Even if it's not your fault and you know it's not your fault, the people that are going to know about this, they don't know that it's not your fault and my credit rating, I knew that my credit rating was going to take a nosedive over there and it wasn't because I didn't pay it, it was because somebody I loved 14 years ago didn't pay his bills. My credit rating is now going to fall and if I want to buy a new car or if I want to buy a home, I'm SOL. I worked hard for that credit rating and now I'm just SOL.
        What little bit of safety net I had, this lawsuit was going to effect (sic) that. I had a little bit of a safety net, I thought maybe for [un]expected expenses, maybe a tiny little bit of extra retirement. It was just going to really, really, really change my life.

[*Id*. at 61-62.] Addressing the erroneous judgment and garnishment required five trips to Lafayette to meet with her lawyer and for court dates, necessitating time off work. [*Id*. at 63.] Rosen testified that she suffered "massive headaches, heart palpitations, extreme stress, extreme anxiety." [*Id*.]

Eventually, Rosen was successful in challenging the default judgment, and she was granted relief from the garnishment order on January 16, 2019. Five months later on June 4, 2019, Meyer and MLO filed a consent to set aside the default judgment, acknowledging that they lacked conclusive proof that Rosen had been served with notice of the action.

Rosen then went on the offensive, filing this action under the FDCPA on April 12, 2019, naming both MLO and Myers as defendants. The complaint covered 18 pages and twelve counts. In it, Rosen requested both statutory penalties as well as actual damages

including compensation for the emotional distress she suffered as a result of the defendants' actions. Discovery ensued and lasted for nearly two years. There was never a real issue in the case over liability.  It was pretty clear to everyone that the defendants violated several provisions of the FDCPA in their efforts to collect her ex-husband's debt from Rosen.  And indeed, Meyer and MLO eventually admitted liability to some of the causes of action set out in the complaint. But the issue of damages was hotly contested. Although the defendants admitted that Rosen was entitled to statutory damages of $1,000, the defendants were steadfast in their belief that Rosen could not recover damages for her emotional distress.

Eventually, the defendants sought summary judgment on Rosen's emotional distress damages claim. [DE 35, 36.] The defendants were of the belief that Rosen's damages were much more limited than she believed them to be. The briefing was extensive.  It included an initial brief from the defendants, a response from Rosen, a reply by defendants, a motion to strike, a request to file a sur-reply by Rosen, a sur-reply, and then a response to the sur-reply by the defendants. [DE 35-46.]  Suffice it to say everyone was touching each base with two feet well knowing that the outcome could greatly affect the value of the case. In the end, in my 17-page opinion on summary judgment, I found that Rosen, in addition to other actual damages, presented sufficient non-conjectural evidence of emotional distress she suffered because of the defendants' actions, and that the matter of Rosen's damages needed to be decided by a jury. [DE 47.] Summary judgment was therefore denied, and the matter was set for trial.

Magistrate Judge John E. Martin subsequently held a settlement conference during which the parties failed to resolve the matter. [DE 54, 55.] On June 29, 2021, I held the final pretrial conference followed by another settlement conference. [DE 59, 60.] At this settlement conference, the defendants agreed to pay Rosen a sum far in excess of what they had previously offered in the case, mostly due to the risk they then faced in light of the summary judgment ruling. But because the case involved fee shifting under the FDCPA, the issue of attorney fees remained a stumbling block. At the settlement conference, the parties could not reach agreement on an appropriate fee award, and instead agreed to leave the issue to me to resolve. Extensive briefing followed on the issue of attorney fees, and the matter is now ripe for decision.

## Discussion

Rosen requests attorney fees in the amount of $101,190 and costs of $5,830.92. [DE 72 at 10.] The defendants do not dispute the costs, but respond that the fees should be "no more than $40,000." [DE 66 at 25.] The defendants repeatedly tell me that this was a "simple case." But that is only partially true. As I noted above, there was never any real question in this case over liability; it was plain to everyone that the defendants violated several provision of the FDCPA. But on the issue of damages, the case was decidedly not simple. The real dispute related to whether Rosen, in addition to her monetary damages, could recover damages for the emotional injuries she suffered in the process of the unlawful debt collection effort.

Fee shifting is an important component of the enforcement of consumer protection laws. The purpose of fee shifting in consumer protection statutes like the FDCPA is to assist people like Ms. Rosen, who might otherwise not be able to vindicate her interests, to do so with the help of competent counsel. *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010). To determine what is a reasonable fee award in a statutory fee shifting case, I need to determine the lodestar — the number of hours reasonably expended on the case multiplied by the lawyer's reasonable hourly rate. *Tolentino v. Friedman*, 46 F.3d 645, 652 (7th Cir. 1995). There is a "strong presumption" that the lodestar calculation represents a reasonable fee. *Perdue*, 559 U.S. at 552.

After the lodestar is arrived at, the court must decide whether to adjust the lodestar up or down to "to reflect various factors including the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau v. Wright*, 592 F.3d 747, 749 (7th Cir. 2010) (internal quotes and cites omitted). *See also Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Farrar v. Hobby*, 506 U.S. 103 (1992). Ultimately, the standard is "whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." *Gastineau*, 592 F.3d at 748 (internal quotations omitted).

### Determining a Reasonable Hourly Rate

Rosen was assisted in this case by two attorneys, Duran Keller and Robert Duff, both of whom are experienced consumer protection lawyers. Mr. Keller requests a rate of $400 per hour. Mr. Duff requests $445 per hour. At the outset, it must be noted that

10

the defendants specifically stated in their briefing that there was nothing unreasonable about the rates being proposed. They tell me there is "little reason to quibble with the requested rates and agree[] that the record generally supports the contention." [DE 66 at 13.] This is undeniably true.  The rates requested are well supported by comprehensive affidavits submitted by Mr. Duff and Mr. Keller attesting to why their rates are reasonable given their level of experience in consumer protection litigation. [DE 65-1, 65-2.]

Mr. Keller has been practicing consumer law for seven years throughout the country. [DE 65-1.]  He is an elected board member of the National Association of Consumer Advocates. He is frequently called upon to speak at conferences on consumer law issues.  He is lead counsel in several consumer class action cases and has tried several consumer law cases in both state and federal courts around the country. Four years ago, in 2018, two judges of this court approved a fee rate of $350 per hour for Mr. Keller's services.  *Gaeta v. Mercer Belanger, P.C.*, 4:16CV58, U.S. Dist. LEXIS 200888 (N.D. Ind. Nov. 27, 2018); *McKinnis v. Prof'l Account Servs.*, 4:18CV4, 2018 U.S. Dist. LEXIS 63501 (N.D. Ind.  Apr. 16 2018). Mr. Keller further avers that his hourly rate has increased in the four years since the cases I cited, and he now charges clients $400 per hour on cases where he is "paid directly from clients." [DE 65-1 at 6.] This is important because the rate the attorney commands in the market is integral in determining what rate is reasonable. *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011).

As for Mr. Duff, he is even more experienced than Mr. Keller. According to the comprehensive affidavit supplied by him, he has been practicing in the area of consumer law for over 26 years.  For the first several years of his career he worked defending consumer law cases for large national companies such as Wal-Mart, Ford, Mitsubishi and Toyota as well as the prominent credit reporting agency, TransUnion. In 2007 Mr. Duff switched sides and opened the Consumer Law Group, which he tells me is the only private Indiana-based law firm focusing exclusively on consumer litigation on behalf of Indiana consumers. [DE 65-2 at 2.] He is a member of the National Association of Consumer Advocates, presents frequently at industry conferences and local CLE events. He has litigated hundreds of consumer cases throughout the Midwest acting, in his words, as a "private attorney general" enforcing a variety of consumer statutes for clients.  He has been certified as lead counsel in several consumer class actions.  Finally, Mr. Duff avers that dozens of courts have approved his hourly rate of $445 per hour in fee shifting cases like this one over the course of the past two years. [DE 65-2 at 5.]

What's more, I do not need to take Mr. Keller and Mr. Duff's word on the reasonableness of their hourly rates.  The requested amounts are supported by affidavits from three experts in the practice area of consumer protection — Jon Laramore, David Philipps and Professor Judith Fox. [DE 65-3, 65-4 and 65-5.] Each expert has provided well documented and persuasive evidence of the reasonableness of the rates being requested by both Mr. Keller and Mr Duff.

In response, the defendants have largely conceded that the rates requested are reasonable. As I said above, they told me in their brief they have "little reason to quibble with the requested rates" and that the record "supports the contention." [DE 66 at 13.] They certainly have presented no evidence to the contrary. And in the absence of any evidence to the contrary, the defendants have left me no choice but to accept the rates requested by Rosen's counsel which, to repeat, are very well supported.

The only argument the defendants muster is that Mr. Keller's fee should be limited to what Rosen agreed to pay him in the underlying collection action — the ill-conceived litigation that started this mess. They cite to *Assessment Technologies of WI v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir. 2004), where the court stated that "the best evidence of the value of the lawyer's services is what the client agreed to pay him." But there are a number of problems with this argument, not the least of which is that we do not know how much Rosen agreed to pay Keller. The defendants attempted to get an answer to that question in discovery, but Rosen balked, arguing that the information requested was protected by the attorney-client and work product privileges. [DE 66-9.] That may or may not have been correct. But the problem for the defendants is they chose to not push the issue with a motion to compel the information. So we are left without any *evidence* of what Rosen agreed to pay Keller to defend her in the original collections matter.

But let's suppose we did know how much Rosen agreed to pay Keller. I'm not sure it matters a whole lot because the agreement would have been for Keller to

represent her in a simple collections case.  What is a reasonable amount for a lawyer to charge in a simple collections matter has little probative value as to what that same lawyer may charge in a complex consumer law case.  If Mr. Keller charged Rosen less than he otherwise would, it may reflect the fact that Rosen was indigent, or nearly so, and did not have the ability to pay the higher rate. Or perhaps he charged less because of the relative ease of the task at hand – defending a bogus collections matter.

In any event, this is what makes *Assessment Technologies,* and cases like it cited by the defendants, inapt even if we were to get that far.  In that case the defendant agreed to pay its lawyer $7500 to come up with wording for an injunction in a copyright case, and the fee petition at issue was for success in that copyright case.  That was the context in which the court stated that "the best evidence of the value of the lawyer's services is what the client agreed to pay him." 361 F.3d at 438. Implicit in that quote is the notion that the client agreed to pay the lawyer that amount *for a copyright case,* the very type of case for which fees were being requested.  As I have said, it is not at all probative in a fee dispute in a complicated consumer protection case what Ms. Rosen, a basically indigent person, agreed to pay her lawyer in a related, but entirely different collections matter.

In sum, Rosen has supported her request for the proposed rates with comprehensive affidavits from both the lawyers themselves and from three experts in the field.  By contrast, the defendants have presented me with no evidence at all. Their half-hearted effort to squeeze the facts of this case into the analysis used by the Seventh

Circuit in *Assessment Technologies* is both unsupported by evidence, and an apples-to-oranges comparison in any event. The hourly rates of $400 for Mr. Keller and $445 for Mr. Duff will therefore be approved.

### Determining the Number of Hours Reasonably Expended

Mr. Keller tells me he spent 130 hours litigating this case on behalf of Ms. Rosen; Mr. Duff spent a total of 104 hours. [DE 65-1; 65-2; 72-1; 72-2.] Mr. Keller requests a fee award of $52,000 (130 hours times $400 per hour) and Mr. Duff requests $46,280 (104 hours times $445 per hour). The first question, therefore, is whether 234 hours — the total amount of time spent by the plaintiffs' lawyers in this case — was reasonable. *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014).

The combined total of 234 hours expended by Mr. Duff and Mr. Keller equals a little less than six weeks of combined work on this case (5.85 weeks to be precise – 234 divided by a 40 hour work week). That amount does not, on it face, strike me as unusually high. This case was filed in April of 2019 and it was hotly litigated. On the one hand, as noted by the defendants, this was a simple case — at least as it related to liability. There was never any real question whether Mr. Myer violated the FDCPA when he engaged in his erroneous effort to collect a debt from Ms. Rosen that she never owed. But the issue of damages was never simple. And that is what extended the case. A review of the docket shows that for more than two years, the parties engaged in extensive discovery, attended many court hearings, engaged in multiple settlement conferences and filed comprehensive briefing on many legal issues.

15

In sum, 234 hours does not strike me as an unusually high number of hours expended given the complexity of the case, and how the case developed. Therefore, the lodestar in this case is $98,280 which represents a total number of hours reasonably expended of 234 hours multiplied by a rate of either $400 (for Mr. Keller) or $445 (for Mr. Duff).   Rosen also seeks reimbursement for the fees of a paralegal in attorney Keller's office, billed at the rate of $125 per hour.  The number of paralegal hours initially claimed was 18.4 [DE 65-1 at 8], but was later corrected to 14.2 for a total of $1,775 [DE 72-1 at 1].  The defendants have expressed no opposition specifically directed to the paralegal fees, which I deem to be reasonable and appropriately awarded.

### Is there a Basis to Adjust the Lodestar

The final issue is whether there is a reason to adjust the lodestar in this case. It is true that the defendants attempted to keep this case "simple" by limiting Ms. Rosen's damages to the little bit of monetary damages she suffered plus the statutory penalties. The defendants well knew that if emotional distress damages were on the table, the entire complexion of the case would change.  Indeed, the defendants tried to buy Ms. Rosen off with an early settlement offer of $3500. [DE 66 at 4.] Rosen quickly rejected the offer as entirely inadequate and filed suit.  Shortly thereafter, the defendant made an offer of judgment of $15,000 with fees to be decided by the court. [DE 66 at 1, 21.] Rosen refused the offer and the case went forward with substantial discovery and motion practice.  At an initial settlement conference in front of Judge Martin, the

defendant continued to play hard ball and the case didn't settle.  It wasn't until the matter was fully briefed on summary judgment and the defendants lost, that the case eventually settled — and indeed, settled for a sum much higher than what the defendants were willing to pay prior to the summary judgment ruling.

In the face of this record, the defendants try to convince me that it was *Ms. Rosen* who unnecessarily prolonged the litigation.  The suggestion is frankly ridiculous.  All Ms. Rosen did was refuse to accept what she believed to be unreasonably low offers that failed to take into account the misery she had been put through by the actions of the defendants.  The Seventh Circuit has held that a court can take into account to reduce a fee request the fact that a party accepted a settlement offer lower than one made earlier in the case. *Connolly v. Nat'l Sch. Bus Serv.*, 177 F.3d 593, 598 (7th Cir. 1999).  Surely, the corollary of that principle is also relevant to my consideration.  The fact that the plaintiff turned down several lower offers and held out for – and obtained – a better result can be taken into account when denying a reduction in fees.

The bottom line is that Ms. Rosen was a highly sympathetic figure and the defendants well knew that, having admitted liability, if the issue of emotional distress got to a jury, they could have been hit with a large verdict. So they fought tooth and nail to prevent that, and indeed *that* is what extended the litigation.  It wasn't until I issued my summary judgment ruling that the parties were able to negotiate a settlement, in an amount far and away higher than any offer she was made prior to litigating the

damages issue.[1] So the defendants chose to gamble that the emotional distress damages would be off the table in this case, and the bet didn't pay off. For her part, Ms. Rosen simply was willing to stay strong and hold out for what she believed was a fair settlement amount. And she was successful. To somehow turn that all on its head and suggest that she (or her attorneys) should be penalized for not taking a substantially lesser offer earlier in the litigation strikes me as unjust.

The defendants next claim that the lodestar should be adjusted because Rosen employed the services of two experienced consumer protection lawyers when one would have been enough. Let's set aside for the moment that the defendants also had two lawyers on the case. [DE 4, 19.] I agree with my colleague who recently noted that staffing a case with two lawyers is the norm these days. *D.D.M. v. School City of Hammond*, 2:17CV177, 2020 WL 6826490, at *8 (N.D. Ind. Nov. 19, 2020). Indeed, I simply fail to see how Rosen's use of two lawyers, without more, is particularly pertinent to my inquiry. What is relevant is if those lawyers were doing the same work thus resulting in duplicative billing. *Schlacher v. Law Office of Phillip J. Rotche & Associates, P.C*, 574 F.3d 852, 858 (7th Cir. 2009).

Defendants tell me, on the one hand, that after Duff entered the case and worked on the summary judgment briefing, he remained in the case and that "virtually every piece of litigation that followed contained duplicative entries from both" Duff and

---

[1]Given the confidentiality of the settlement amount, I will refrain in this opinion from being specific on all of the back and forth of settlement negotiations and the final settlement figure.

Keller. [DE 66 at 10.] Yet that statement contains no citation to the record showing me where exactly the duplicative entries are.  [*Id*.]  Perhaps that is because the defendants also admit that they didn't engage in "a line by line analysis of each billing entry by Rosen's attorneys, and ha[ve] instead focused upon the big picture."  [*Id*. at 12, n. 6.] Evidently, the defendants want me to do what they were unwilling to do – go line by line through the billing statements of Keller and Duff and find inconsistencies or evidence of duplicative billing. That is what makes this case different from *Schlacter*, where the court noted that the defendant made "detailed objections to the hours billed, identifying precisely which entries were excessive or redundant." *Id*. at 858-59. *See also Montanez v. Simon*, 755 F.3d 547, 555 (7th Cir. 2014) (lodestar adjusted downward based on a party's "line-by-line objections" to billing  entries).  It was from those objections that the court reasonably reduced the fee award.  But here the defendants did not undertake that effort, choosing instead to focus on "big picture issues." [DE 66 at 12, n. 6.]

Despite defendants failure to do so, I have reviewed the billing records in this case. It is true that there are some overlapping entries between Mr. Duff and Mr. Keller.  But those almost always involve them consulting with one another and discussing case strategy together.  Consultation of that kind is highly appropriate, efficient, and is exactly what lawyers in firms of all sizes do to best serve their clients. *See, e.g. Bohen v. City of East Chicago*, 666 F.Supp. 154, 157 (N.D.Ind. 1987) ( "The use of more than one lawyer is common in legal practice. Consultation among lawyers insures that they do not overlook significant facts or injuries.") (Easterbrook, C.J., sitting by designation). In sum, I see no

19

basis to reduce the fee award here simply because Ms. Rosen used two lawyers to prosecute her case.

## Conclusion

Kimberly Rosen is entitled to an award of attorney's fees under the FDCPA, 15 U.S.C. §1692k(c)(a)(3), as agreed by the parties, in an amount to be determined by me. Rosen's counsel have amply demonstrated the reasonableness of their requested hourly rates.  I find that the hours Rosen's counsel expended on the litigation were also reasonable and not excessive.  No basis for reducing the resulting lodestar determination of the fee award has been demonstrated by the defendants.  I calculate the award of fees as follows.

Attorney fees for Keller:  130 hours x $400/hr = $ 52,000.00

Paralegal fees for Keller's firm:  14.2 hours x $125/hr = $   1,775.00

Attorney fees for Duff:  104 hours x $445/hr = $ 46,280.00

Total fees = $100,055.00

Rosen is also entitled to her costs, and defendants have not contested the claimed amounts, $5,642.46 for Keller and $188.16 for Duff.  These amounts total $46,468.16 incurred by Duff's Indiana Consumer Law Group, and $59,417.46 incurred by Keller Law.

**ACCORDINGLY:**

Plaintiff Kimberly S. Rosen's Motion for Award of Attorney's Fees and Costs [DE 64] is GRANTED as follows.

Plaintiff is awarded from defendants MLO Acquisitions and Walter Christian Meyer a total of $100,055.00 in attorney and paralegal fees, and $5,830.62 in costs, all as itemized in this opinion.

**SO ORDERED.**

**ENTERED:  January 28, 2022.**

　　　　　　　　　　　　　　　　 **/s/   Philip P. Simon**
                              **UNITED STATES DISTRICT JUDGE**